## County of Presidio v. City National Bank of Paducah.

### Decided February 16, 1898.

**1. Practice on Appeal—Conclusions of Fact.**

Where there is no statement of facts in the record, the findings of fact of the trial judge will be adopted as the conclusions of fact of the Court of Civil Appeals.

**2. County Bonds—Validity—Provision for Interest and Sinking Fund.**

Failure of the commissioners court to make provision for the interest and sinking fund of county bonds does not invalidate them, as the requirement of the Constitution relative thereto (article 11, section 7) is fully met by the legislative provision on the subject. Following Mitchell County v. Bank, 91 Texas, 370.

**3. Counties—Estoppel as to County Seat.**

Where a county seat was illegally removed, but the new county seat has been used by the county as such for ten years, all the county courts being held there, and it has been indirectly recognized as the county seat by the Legislature and the appellate courts, the county is estopped from denying the validity of its outstanding bonds issued for the erection of a courthouse at the new county seat on the ground that such removal was illegal

**4. Same—Collateral Attack—County Bonds.**

The validity of county courthouse bonds in the hands of purchasers thereof can not be collateraly attacked by the county, when sued thereon, by the defense that the county seat was illegally removed to the place where the courthouse was built.

**5. Act of Legislature at Special Session—Evidence to Show Invalidity.**

The proclamation of the Governor and the journals of the two houses are not competent evidence to show that an act passed at a special session of the Legislature is invalid because its subject matter was not embraced in the proclamation. Following Williams v. Taylor, 87 Texas, 667.

**6. Judgment Against County—Directing Execution.**

A judgment against a county is not rendered invalid by the fact that it improperly directs that execution issue thereon against the county.

APPEAL from Presidio. Tried below before Hon. C. N. BUCKLER.

*Floyd McGown, W. W. Turney,* and *P. H. Clarke,* for appellants.

*Millard Patterson,* for appellee.

FLY, ASSOCIATE JUSTICE.—The City National Bank of Paducah, Ky., sued the county of Presidio to recover of it the sum of $5760 alleged to be due as interest on certain bonds issued by the county to build a courthouse. A trial resulted in a judgment for the plaintiff, who is appellee in this court.

There is no statement of facts, and it follows that the findings of facts of the trial judge must be adopted as the conclusion of fact of this court.

The first, second, and ninth assignments present as error the action of the court in overruling the general demurrer and special exceptions which attacked the petition on the ground that it failed to allege that any sinking fund or interest was provided for as required by article 11, section 7, of the State Constitution. In a recent case involving the same question, the Supreme Court has held that the constitutional requirement is fully met by the legislative provision for a sinking fund and the

interest on county bonds, and that failure upon the part of the commissioners court to make such provision did not render the bonds invalid. It follows that it was not necessary to allege in the petition that a law of Texas providing for the sinking fund and interest had been passed by the Legislature. Mitchell County v. National Bank, 91 Texas, 370.

The fifteenth assignment of error raises the question of the illegality of the bonds, because they were issued for the purpose of building a courthouse at Marfa at a time when the county had a courthouse at Fort Davis, the legal county seat, and from which the county seat had never been legally removed. It may be assumed that the evidence showed that the county seat was legally located at Fort Davis and that the removal from that place to Marfa was illegal, because the proposition for removal was not sanctioned by two-thirds of the voters of Presidio County. The removal to Marfa took place in 1885, and since that time the District Court has regularly met and performed the functions committed to it by the State, the probate court has performed its business, the Commissioners Court has regularly met there and levied taxes and attended to the other business of the county, the deeds and mortgages have been recorded, and in fact all the business of the county has been performed there. Causes have been tried in the District Court at Marfa and appealed to the Supreme Court, some in which the question of the legality of the removal was directly involved, and the Supreme Court has entertained jurisdiction. Caruthers v. Hornett, 67 Texas, 128; Caruthers v. State, 67 Texas, 132. In 1887 the Legislature of Texas formed out of territory belonging to Presidio County additional counties, among the number being the county of Jeff Davis, in which was situated Fort Davis. Acts 1887, pp. 26, 27. Again, in 1889 the Legislature, in an amendment to the acts creating Brewster, Buchel, Foley, and Jeff Davis counties, stated in the emergency clause that "in the creation of the counties of Brewster and Jeff Davis, and fixing their boundaries, they were placed within less than twelve miles of Marfa, the county seat of Presidio County," which is an indirect recognition of the fact that Marfa was the legal county seat. In view of all these facts, we are of the opinion that appellant should not be heard to question the validity of bonds out of whose proceeds the courthouse it has been using for the last ten years was built.

The removal to Marfa was not in violation of any constitutional provision, because the Constitution, article 9, section 2, places no limitation upon removals of county seats, except that no county seat within five miles of the geographical center of a county shall be removed except by a vote of two-thirds of the voters. The Legislature is clothed with full power to pass laws covering the question. It was therefore a legislative provision that was violated by the removal to Marfa, and the violation was not only acquiesced in by the people of the county but by the courts of the State, and was ratified by the Legislature. Had there been a speedy challenge by the State or anyone interested a different case would have been presented, perhaps; but it is too late now to assail the

very existence of a county that has been so long recognized for all purposes appertaining to county government. As said in Ashley v. Board of Supervisors, 60 Federal Reporter, 55, "the public interests have been adjusted to the actual condition of things, and private interests have become settled upon the foundations which local authority has laid, with consent of the State, whose business it was to interfere and prevent the mischief, if any such were feared. It is a matter peculiarly within the province and duty of the State to watch over and prevent the development of political growths which are likely to be prejudicial to the public interests. When it does not interfere, private individuals are justified in assuming that there is nothing obnoxious in the organization, and that they may treat with it in the character it has assumed." Shall it be held that persons ignorant of any illegality in the selection of a county seat, who in the ordinary course of trade in the open market pay value in good faith for the bonds of a county that is recognized as a subdivision of the State, whose county seat is recognized by different branches of the State government, and the inhabitants, shall have his right disregarded, his debts repudiated, and his property destroyed, because there has been some violation of law in the selection of such county site of which he has no knowledge, and about which he was not in any manner put upon inquiry? Such a doctrine would be subversive of principles of good faith, and public policy demands that the power of a county to refuse payment of its debts on such grounds should not be tolerated. It would be dangerous and wrong to permit a county, for the purpose of evading payment of money used in erecting a building that forms a shelter for its officers, to attack the validity of its own existence. But it is insisted that the cases of Caruthers v. Hornett and Caruthers v. State, above cited, do sustain such doctrine; but no such deduction can be legitimately drawn from those cases. The decisions were rendered in 1886, shortly after the removal occurred. In the first case Caruthers, the county treasurer of Presidio County, had sued Hornett, the county judge, and two commissioners, and asked an injunction to restrain them from removing him from office, and also prayed that they be required to remove the county seat back to Fort Davis. The District Court, sitting at Marfa, held that he had no cause of action, and the Supreme Court affirmed the judgment. After settling every point that was raised in the case or necessary or proper to a decision of the case, it is said: "It does not follow from this, however, when a right involving pecuniary interest, not originating in the election, is asserted, that no inquiry can be made as to the legality of an election when it is set up to defeat such a right. In such case, when there is no controversy as to the vote cast, and the effect of that vote is to be determined as a matter of law, there can be no objection to considering it, whatever may be the form of action, and to giving to the vote cast in favor of or against a given measure its proper and legitimate legal effect." This language was not called for in the decision of the case and was

purely obiter. And yet if it had been, very different circumstances surrounded that case from those connected with this. That was before any recognition of the county seat by the State, and before the rights of innocent parties had grown up under the state of affairs then existing. In the case of Caruthers v. State it was in effect held that there had been no legal removal, and that Caruthers was not guilty of official misconduct in not removing his office of county treasurer from Fort Davis to Marfa. Both of those propositions were doubtless sound, and yet they do not militate against the principles hereinbefore stated. As said by the Supreme Court of Michigan, "If this question had been raised immediately, we are not prepared to say that it would have been altogether free from difficulty. But inasmuch as the arrangement there indicated had been acted upon for ten years before the recent legislation, and had been recognized as valid by all parties interested, it can not now be disturbed. Even in private associations, the acts of parties interested may often estop them from relying on legal objections which might have availed them if not waived. But in public affairs, where the people have organized themselves, under color of law, into the ordinary municipal bodies, and have gone on, year after year, raising taxes, making improvements, and exercising their usual franchises, their rights are properly regarded as depending quite as much on acquiescence as on the regularity of their origin, and no ex post facto inquiry can be permitted to undo their corporate existence. Whatever may be the rights of individuals before such general acquiescence, the corporate standing of the community can be no longer open to question." People v. Maynard, 15 Mich., 463.

If there is no county seat in Presidio County, as contended by appellant, then there is no organized county there, and every will probated and every estate administered is illegal and void, taxes have been unlawfully assessed, levied, and collected, property rights have been unlawfully disturbed, and the stamp of nullity is placed on every act of the county government since 1885. This would create a lamentable state of affairs, and evils of the most serious character would result.

Speaking to the question of State sanction to the regularity of the organization of a county, through its executive and legislative departments, it was said by the Supreme Court of the United States: "When both of these departments give notice to the world that a county within the territorial limits has been duly organized and exists with full power of contracting, can it be that a purchaser can not in open market safely purchase the securities of that county? Does the duty rest on him to traverse the limits of the county and make personal inspection of the number of inhabitants? If any wrong has been done to the county through the want of attention on the part of the State authorities, equity would suggest that the State should bear the burden, and not cast it upon an innocent party residing far from the State and acting in reliance upon what it has done." Comanche County v. Lewis, 133 U. S., 198. As to acts of the Legislature being sufficient recognition, we again cite Ashley v. Board.

The district judge found "that the plaintiff became and is the owner and holder of said bonds (with their coupons), having paid value for same in the regular course of business in open market without notice of any defect in the same." The bonds are payable to bearer, and recite that they were issued for the erection of a courthouse. Under a similar state of facts the Supreme Court said: "If a purchaser were bound to inquire into the existence of the facts which empowered the court to issue bonds to build a courthouse, and to know that the county had no courthouse, in view of the recitals upon the face of the obligations he was bound to look no further. He had the right to rely upon the truth of such recitals, and having paid value for the bonds without actual knowledge of their illegality, the county would be estopped to set up that they were not issued for the purpose for which they purported to be issued." Nolan County v. State, 83 Texas, 183.

That language is the righteous answer to the demands of justice, honesty, and good faith.

That the defense offered by the county was a collateral and not a direct attack on the validity of the removal of the county seat, we think, is clear, and there is good authority to the effect that "if the Constitution had expressly declared the requirements and the method to be pursued, the fact would remain that the organization which the county had taken on under color of the statute, and in the form of which it acted without question by the State, could not be attacked collaterally." Cool. Const. Lim., 254; City of St. Louis v. Shields, 62 Mo., 247; Ashley v. Board of Supervisors, above cited.

The acts of 1881 and 1884, in relation to the issuance of bonds by counties for the erection of courthouses, as amended by the Act of 1885 (articles 986a, 986d, Sayles' Statutes) furnished authority for the issuance of the bonds. It is insisted that the Act of 1884, having been passed at a special session and being in connection with a subject not mentioned in the proclamation convening the Legislature, and not being called to their attention in a message, was null and void. To show its nullity the proclamation of the Governor and journals of the two houses were introduced in evidence, which showed that the subject was not mentioned therein. A statute can not be invalidated by such means. Williams v. Taylor, 83 Texas, 667.

The judgment improperly provides for the issuance of execution against the county for the debt, but this is not capable of being carried into effect and does not affect the validity of the judgment. That portion of the judgment will, however, be stricken out, and the judgment as amended will be affirmed.

*Reformed and affirmed.*

Neill, Associate Justice, did not sit in this case.

Writ of error refused.